**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **J.P. MORGAN SECURITIES LLC,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **Plaintiff,** | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| **KIRK J. CUNNINGHAM and** | ) | |
| **TODD R. HELFRICH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT**
**(INJUNCTIVE RELIEF SOUGHT)**

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendants Kirk J. Cunningham ("Cunningham") and Todd R. Helfrich ("Helfrich") (collectively, "Defendants"):

**Preliminary Statement**

1.     This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendants that concurrently is being filed with FINRA Dispute Resolution.

2.     This dispute arises out of Defendants' departure from JPMorgan and the commencement of their employment with Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a director competitor of JPMorgan. Specifically, JPMorgan has recently received a complaint from a client complaining that Defendants had solicited the client and retained the client's confidential contact information upon Defendants' departure from the firm. As set forth in more detail below, JPMorgan also has received two emails from a client showing

that Defendants are soliciting the client, and in fact has recently learned that Defendants have solicited multiple JPMorgan clients to do business with them at their new employer, Merrill Lynch, in violation of their continuing obligations to JPMorgan.

3.       Each Defendant gave notice of his resignation of employment on February 5, 2018, to be effective April 6, 2018, after the expiration of his 60-day garden leave period. After their employment with JPMorgan ended on April 6, 2018, Defendants joined Merrill Lynch in Chicago.  On information and belief, Cunningham and Helfrich work as a team at Merrill Lynch.  At the time of their resignations, Cunningham was an Investment Specialist and Helfrich was a Banker in JPMorgan's Private Bank branch office in Chicago, Illinois.

4.       Defendants have engaged in improper conduct after resigning from JPMorgan, in violation of their agreements with JPMorgan.

5.       JPMorgan has recently learned that since resigning from JPMorgan and joining Merrill Lynch, Defendants are aggressively soliciting JPMorgan clients to move their accounts from JPMorgan to them at Merrill Lynch.  JPMorgan has learned that Defendants are soliciting JPMorgan clients, both via emails and phone calls, including calls to clients on their personal cell phones and emails to their private email addresses, seeking to induce such clients to transfer their accounts from JPMorgan to them at Merrill Lynch.

6.       JPMorgan has learned that on August 3, 2018, Cunningham sent an email to a JPMorgan client soliciting the client's business on behalf of himself and Helfrich.  The email goes beyond simply announcing the Defendants' change in employment, and was sent nearly four months after Defendants left JPMorgan and joined Merrill Lynch.   The email from Cunningham provides, in relevant part:

>       My longtime partner, Todd Helfrich, and I have joined Merrill
>       Lynch's Private Banking and Investment Group from our prior

home at JPMorgan. ***Needless to say, we believe this change will serve our clients well for years to come and we are excited for the new opportunity ahead of us***. As before, we will serve ultra-high net worth families in the Midwest and throughout the country from our home base in Chicago. (Emphasis added).

7. After the receiving this email from Cunningham, the client complained to JPMorgan about receiving this solicitation email from Cunningham, which he did not request. The client further was concerned that Cunningham had taken the client's email addresses upon his departure from JPMorgan and was using them at Merrill Lynch.

8. Just recently, on August 16, 2018, Cunningham sent another solicitation email to the same client, wishing to discuss liquidity management options Cunningham could offer the client at Merrill Lynch. Cunningham's solicitation email to the JPMorgan client states:

I hope you are doing well. I just wanted to highlight a few of our liquidity management options:

- Bank of America is being aggressive on deposits. We have a Preferred Deposit produce currently yielding +1.82%
- We use the BlackRock TempCash Money Market fund which currently yields +2.05%
- We can build a short-term Fixed Income portfolio with a net yield (depending on the amount invested) of ~+3.25%

Happy to discuss. Thanks.

9. The client again complained to JPMorgan about having received such communication from Cunningham.

10. In addition, another JPMorgan client recently reported to JPMorgan that he received a letter from one or both of Defendants soliciting the client's business and providing Merrill Lynch marketing materials and/or pitch books, which the client did not request.

11. In yet another recent client solicitation by Defendants, a JPMorgan client informed the firm that Cunningham called him multiple times in an effort to induce the client to

transfer his assets to Merrill Lynch. The client noted that Cunningham asked him to move assets to Merrill Lynch because Cunningham gets paid based on client assets that he is able to move from JPMorgan to Merrill Lynch.

12.     Other JPMorgan clients similarly have indicated that they have received calls – many on their cell phones – from Defendants seeking to discuss doing business with them at Merrill Lynch. JPMorgan employees have spoken with many of the clients that Defendants were assigned to service during their JPMorgan employment, a significant number of whom have informed JPMorgan that they have been contacted by either Cunningham or Helfrich soliciting their business on behalf of Merrill Lynch. On information and belief, Defendants have solicited at least six JPMorgan clients since joining Merrill Lynch. Many clients have indicated that Defendants have contacted them, whether by email, phone calls, and/or in person, and some on multiple occasions, seeking to discuss doing business with them at Merrill Lynch.

13.     In addition to and as part of their solicitation efforts, Defendants are bad-mouthing JPMorgan and making false statements about JPMorgan and its advisors in their calls with clients. In an effort to induce JPMorgan clients to transfer their business to them at Merrill Lynch, several JPMorgan clients have informed the firm that Defendants are stating that JPMorgan only has junior people left to manage the client accounts, that JPMorgan does not have enough advisors left to cover its clients, and that JPMorgan forces its clients to use only its own products. "Smaller" clients have informed JPMorgan that Defendants are telling them that the Private Bank will only be covering larger clients and that they – as smaller clients – will be moved to a smaller platform at JPMorgan. Conversely, "larger" clients have informed JPMorgan that Defendants are telling them that the Private Bank is focusing all of its efforts on "smaller" clients, not on them.

14.     Specifically, JPMorgan clients have informed the firm that Helfrich told them that:  JPMorgan does not have enough people to cover its clients; junior people at JPMorgan would be taking over their accounts; JPMorgan has an inferior investment platform to Merrill Lynch's platform; and Defendants left JPMorgan because it "forced" them to use only JPMorgan products.

15.     Additionally, JPMorgan clients have informed the firm that Cunningham told them that:  junior people at JPMorgan would be taking over their accounts because JPMorgan did not have sufficient staff to cover clients; JPMorgan's fees that it charged its clients were too high; and JPMorgan used only JPMorgan products.

16.     These comments are false and can only be seen as designed to induce JPMorgan clients to transfer their business to Defendants at Merrill Lynch.

17.     In addition, on information and belief, Defendants improperly took with them to Merrill Lynch JPMorgan's confidential client information, including contact information, such as cell phone numbers and email addresses, which generally are not publicly available, and without which Defendants would have been unable to commence calling, emailing and soliciting JPMorgan clients upon their resignation.  As noted above, JPMorgan clients have expressed concern and frustration to JPMorgan that Defendants had their personal and private contact information at Merrill Lynch and are using such information to contact such clients since Defendants' resignations from JPMorgan.

18.     Unfortunately, it appears that Defendants' improper solicitation efforts have proved successful, as several JPMorgan clients, with assets totaling approximately $160 million, already have transferred their accounts to Defendants at Merrill Lynch.

19.     At the time he left JPMorgan, Cunningham serviced approximately 67 JPMorgan clients, the vast majority of whom were pre-existing JPMorgan clients at the time they were assigned to Cunningham; the remainder were developed by a JPMorgan Private Bank Team.  Cunningham did not independently originate any clients at JPMorgan.  The clients whom JPMorgan had assigned to Cunningham to service had a total of in excess of $8 billion in total client positions at JPMorgan.

20.     At the time he left JPMorgan, Helfrich serviced approximately 60 JPMorgan clients, the vast majority of whom were pre-existing JPMorgan clients at the time they were assigned to Helfrich; the remainder were developed by a JPMorgan Private Bank Team. Helfrich did not independently originate any clients at JPMorgan.  The clients whom JPMorgan had assigned to Helfrich to service had a total of in excess of $9 billion in total client positions at JPMorgan.

21.     Accounting for overlap, Defendants collectively serviced approximately 110 JPMorgan clients, with in excess of $14 billion in total client positions.  The vast majority of these clients serviced and recently contacted by Defendants are long term clients and have been clients of JPMorgan or its predecessors for in excess of 10 years.  In fact, approximately 80% of the clients serviced by Helfrich and 69% of the clients serviced by Cunningham have been JPMorgan clients for over 10 years.  Defendants now seek to improperly induce such JPMorgan clients to follow them to Merrill Lynch.

22.     Defendants' conduct constitutes a breach of their Offer Letters with JPMorgan (which contain non-solicitation and confidentiality provisions), JPMorgan's Code of Conduct (which they agreed to abide by), JPMorgan's Long-Term Incentive Plan, Terms and Conditions, Restricted Stock Unit Award (the "LTIP Terms and Conditions"), under which they

received and accepted awards of JPMorgan stock, and a violation of their common-law obligations to JPMorgan.

23.     To prevent continued irreparable harm arising from Defendants' course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendants from soliciting JPMorgan's clients, and barring Defendants from using JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against Defendants in a related arbitration that JPMorgan also is in the process of commencing.

## Jurisdiction and Venue

24.     The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiff JPMorgan, on the one hand, and Defendants, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Chicago, Illinois.

## The Parties

26.     Plaintiff JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York.  The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of FINRA.  Defendants maintain securities licenses through FINRA.

27.     JPMorgan provides traditional banking, investment, and trust and estates services to high net worth individuals through its Private Bank, which has an office in Chicago

and services clients throughout the Midwest. The Private Bank provides exceptional breadth and depth of wealth management solutions including investing, wealth structuring, capital advisory, philanthropy and banking to JPMorgan's high net worth clients. Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Private Bank adopts a flexible approach. For clients with relatively straightforward investment needs, a single investment advisor typically would be assigned. However, clients with more complicated investment needs typically would be serviced by a team of professionals which, depending on such client's needs, would include a Banker (the relationship person, who is the client's primary contact at JPMorgan), an Associate Banker (*i.e.*, a junior banker), an Investment Specialist (*i.e.*, an investment advisor), a wealth advisor (who is usually an attorney), a trust officer, a credit/loan officer, and a client service person.

28. Defendants are individuals who at all times relevant herein were employed and/or conducted business in Chicago, Illinois and are and were citizens of Illinois. Defendants also are registered representatives currently employed by Merrill Lynch in its Chicago, Illinois office. Defendants were previously employed by JPMorgan in its Chicago, Illinois office.

29. In connection with their status as registered representatives of JPMorgan, Defendants executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer. By executing the Form U-4, Defendants agreed to submit to arbitration disputes, claims and controversies arising between themselves and JPMorgan.

**Factual Allegations**

30. Cunningham has been employed by JPMorgan since 2006. In connection with the commencement of his employment, Cunningham agreed to and accepted the terms of JPMorgan's Offer Letter, dated May 24, 2006 (the "Cunningham Offer Letter"). Attachment A

to the Cunningham Offer Letter, which is expressly incorporated into and made part of the Offer Letter, contains provisions prohibiting Cunningham from soliciting JPMorgan's clients for a one-year period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information.

31.     Helfrich has been employed by JPMorgan since 2010.  In connection with the commencement of his employment, Helfrich agreed to and accepted the terms of JPMorgan's Offer Letter, dated February 16, 2010 (the "Helfrich Offer Letter").  Attachment A to the Helfrich Offer Letter, which is expressly incorporated into and made part of the Offer Letter, contains provisions prohibiting Helfrich from soliciting JPMorgan's clients for a one-year period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information.

32.     At the time of his resignation, Cunningham was an Investment Specialist (also known as "Investor"), and had the corporate bank title of Executive Director.

33.     An Investor serves on JPMorgan's team of specialists and is responsible for helping the JPMorgan Bankers (who have the primary relationship with clients) advise JPMorgan clients concerning their investments.  An Investor at JPMorgan's Private Bank is responsible for advising JPMorgan clients concerning their investments.  As an Investor, Cunningham's responsibilities included conducting investment reviews with existing JPMorgan clients to address their investment objectives, making recommendations of appropriate investment products, developing investment strategies, and advising on asset allocation.  As an Investor, Cunningham's primary responsibilities were to service existing JPMorgan clients, not to develop new clients.

34. At the time of his resignation, Helfrich was a Banker, and had the corporate bank title of Executive Director.

35. A Banker at JPMorgan's Private Bank is the overall relationship manager for Private Bank clients, who are high net worth individuals and their families, businesses, foundations and endowments, attending to each client's traditional banking, investment, and trust and estate needs. As a Banker, their job is to help coordinate the JPMorgan team that focuses on providing financial and investment advice and solutions for JPMorgan's Private Bank clients. A Banker's job is to gain a thorough understanding of each client's goals and priorities and to work with a team of JPMorgan specialists to recommend solutions designed to build and preserve the client's wealth by developing a customized, comprehensive investment program.

36. As indicated above, JPMorgan gave Defendants virtually all of the clients they were servicing at the time of their resignations. The clients assigned to Defendants were pre-existing JPMorgan clients who were reassigned to Defendants, were long-term Chase Bank clients who were referred to Defendants, or were developed by JPMorgan at the time they were assigned to Defendants. In fact, as noted above, the vast majority of the clients serviced and recently contacted by Defendants have been clients of JPMorgan or its predecessors for in excess of 10 years. Thus, JPMorgan has a near-permanent relationship with the vast majority of the clients that JPMorgan assigned to Defendants and whom they are now soliciting.

37. JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years. It is with great difficultly, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients, and JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information. JPMorgan clients typically remain with

and continue to be serviced by the firm, regardless of whether the Banker or Investor (such as Defendants) or other team members resign or leave JPMorgan. But for their employment with JPMorgan, Defendants would not have had any contact with virtually any of the clients the firm assigned or referred to them and whom they are now soliciting.

38.     As part of their official duties at JPMorgan, Defendants had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estates needs. As explained in further detail below, such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor such as Merrill Lynch.

## **Defendants' Agreements and Obligations to JPMorgan**

39.     As noted above, Defendants each entered into agreements with JPMorgan that contain non-solicitation and confidentiality provisions.

40.     The Cunningham Offer Letter and the Helfrich Offer Letter are substantially similar, contain provisions prohibiting Defendants from, among other things, soliciting JPMorgan clients for a period of one-year after their employments, and are collectively referred to herein as the "Offer Letters."

41.     Specifically, in Section 6 of Attachment A to the Offer Letters, Defendants agreed not to solicit JPMorgan's clients for a period of one year after the termination of their employment:

> *You understand that J.P. Morgan considers its client and customer relationships, as well as its relationships with its suppliers, important and valuable assets. Accordingly, as a condition of, and consideration for, this offer of employment, unless specifically agreed to in writing, you understand and agree that during the period of your employment with J.P. Morgan and for a period of one (1) year thereafter, you will not on your*

*own behalf or that of any other persons or entities other than J.P. Morgan, directly or indirectly solicit or induce or attempt to solicit or induce to leave or divert or attempt to divert from doing business with J.P. Morgan and then current customers, clients, suppliers, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with J.P. Morgan, or otherwise interfere with the relationship between J.P. Morgan and such customers, clients, suppliers, or other persons or entities. This does not apply to publicly known institutional clients which you service subsequent to your employment with J.P. Morgan without the use of J.P. Morgan confidential or proprietary information.*

42. In Section 7 of Attachment A to the Offer Letters, Defendants acknowledge that the non-solicitation provisions are reasonable and that, in addition to monetary damages, equitable relief is appropriate in the event of their breach of threatened breach of such obligations.

43. The Offer Letters include an Acceptance and Code Affirmation, which Defendants each signed, in which each acknowledges and affirms that he will comply with JPMorgan's Code of Conduct. As set forth in the Acceptance and Code Affirmation, and as further detailed below, Defendants acknowledged that the JPMorgan Code of Conduct imposes on them post-employment responsibilities regarding confidential information and restrictions on the solicitation JPMorgan clients.

44. The Code of Conduct contains certain restrictions on Defendants' conduct during and after their employment with JPMorgan, including a one-year restriction on their solicitation of JPMorgan clients and prohibitions on the use and disclosure of confidential information.

45. Defendants were provided with JPMorgan's Code of Conduct, which was made available to all employees, as it was updated from time to time. Section 3.6 of JPMorgan's Code of Conduct, entitled "Leaving JPMorgan Chase," provides, in relevant part:

*As a condition of working for [JPMorgan], there are certain responsibilities you will have as you leave our Company and as your employment with our Company ends, including:*

- *Returning all Company assets in your possession*

- *Maintaining the confidentiality of information, not only of [JPMorgan] but of those individuals and companies that do business with [JPMorgan]; this does not prevent you from reporting to the government or regulators conduct that you believe to be in violation of law*

*Certain senior employees have additional obligations for one year after they leave [JPMorgan] including prohibitions in soliciting and hiring JPMorgan Chase employees or soliciting certain customers. Some employees are subject to other post-employment restrictions. You have a responsibility to known and comply with the requirements that apply to you. Consult with your Human Resources Business Partner if you have any questions.*

46.     As set forth in Section 1.2 of JPMorgan's Code of Conduct, all JPMorgan employees are required to affirm, either in writing or electronically, that they have read and understood the Code and that they will comply with it.  Section 1.2 provides, in relevant part:

*Each of us has a responsibility to uphold the Code; in fact, compliance with the Code is a term and condition of employment with the Company. This means you must know the Code, you must do the right thing when it comes to your own conduct, and you must speak up about conduct by others that might violate our Code or Company policies . . .*

*Prior to joining the Company, new hires are required to provide an affirmation that they have read and understand the Code, will comply with it and will report suspected violations as required by the Code.  New hires must complete Code training shortly after they begin work.  All employees are required to complete additional Code training and provide a new affirmation periodically, usually annually.  Compliance with these requirements is a condition of employment.*

47.     Each year, Defendants annually affirmed electronically their agreement to comply with the Code of Conduct.

48.     As referenced in Section 3.6 of the Code of Conduct, Defendants also had additional responsibilities to JPMorgan because they were each considered a Senior-Level

Employee (as defined in the "Responsibilities of Former Employees") under JPMorgan's Code of Conduct. Defendants' additional responsibilities under the Code of the Conduct include a one-year prohibition on the solicitation of clients, as set forth in Section 5.3 of the "Responsibilities of Former Employees":

> *The Company considers its customer and supplier relationships, as well as its relationships with is employees, officers, and contractors, important and valuable assets. Accordingly, as a condition of your employment or continued employment, if you are a Senior-Level Employee (as defined in Defined Terms, section 10 of this Policy), then* **for a period of one year after your employment with JPMorgan Chase terminates, you are not permitted to, directly or indirectly**, *on your own behalf or that of any other party, without the prior written consent of the Director of Human Resources of JPMorgan Chase*:

> \*            \*            \*

> • *solicit, encourage, induce or attempt to induce to leave the Company, or divert or attempt to divert from doing business with the Company, any then current customers, suppliers, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with the Company, or otherwise interfere with the relationship between the Company and such customers, suppliers, and other persons or entities. This does not apply to publicly known institutional customers that you service after your employment with the Company terminates without the use of the Company's confidential or proprietary information.* (emphasis added)

49. JPMorgan's "Responsibilities of Former Employees" policy link further provides in Section 5.1, in relevant part:

> *When you leave JPMorgan Chase, you are not permitted to use any Company assets or access its systems or buildings. You must also turn over to the Company, in good condition, all assets of the Company that are in your possession or control (or come into your possession or control in the future), including but, not limited to:*

> \*            \*            \*

> *All Confidential Information, whether maintained electronically or otherwise, including information on mobile or remote computers, such as desktop PCs, laptops, personal digital assistants, pagers, cell phones and all other wireless devices, whether you own the devices or the devices*

14

> *belong to the Company and are used at locations other than a JPMorgan Chase place of business.*
>
> *You are not permitted to duplicate or remove from JPMorgan Chase's premises, or directly or indirectly access, use or disclose to anyone, any Confidential Information. (For a description and additional examples of Confidential Information, refer to section 7 of this Policy and section 1.4 – Dealing with Confidential Information in the Company's Code of Conduct*

50.     Defendants also agreed to similar restrictions by virtue of their participation in JPMorgan's LTIP, under which they received and accepted awards of JPMorgan stock. Pursuant to JPMorgan's LTIP, Defendants were issued restricted stock units, subject to the LTIP's vesting requirements and other plan provisions.

51.     In consideration for accepting the restricted stock units, Defendants agreed to be bound by the LTIP Terms and Conditions. The LTIP Terms and Conditions in prior and subsequent years have identical (or virtually identical) terms.

52.     The LTIP Terms and Conditions contain a provision prohibiting Defendants from soliciting JPMorgan clients (and employees) for a period of one year following the termination of their employment with JPMorgan:

> **During your employment by the Firm and for one year following the termination of your employment,** *or if longer, during the vesting period, if you continue to vest after your employment with the Firm terminates,* **you will not directly or indirectly, whether on your own behalf or on behalf of any other party** *. . . (i) solicit, induce or encourage any of the Firm's then current employees to leave the Firm or apply for employment elsewhere; (ii) hire any employee or former employee who was employed by the Firm at the date your employment terminated . . .; or (iii)* **to the fullest extent enforceable under applicable law, solicit or induce or attempt to induce to leave the Firm, or divert or attempt to divert from doing business with the Firm, any then current customers, suppliers or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with the Firm,** *or otherwise interfere with the relationship between the Firm and such customers, suppliers or other persons or entities. This does not apply to publicly known institutional customers that you service after your employment with the Firm without the use of the Firm's confidential or proprietary information.* (Emphasis added)

15

53.    In addition, the LTIP Terms and Conditions prohibit Defendants from using or disclosing, either during or after their employment with JPMorgan, any confidential information related to JPMorgan's business.

54.    The LTIP Terms and Conditions also contain a non-disparagement provision prohibiting Defendants, either during their employment or after their employment with JPMorgan ends, from making statements that disparage JPMorgan or its employees.

55.    The LTIP Terms and Conditions also provide that JPMorgan shall be entitled to recover its reasonable attorneys' fees and expenses incurred in any proceeding to enforce the terms of the Terms and Conditions in which JPMorgan is the prevailing party.

56.    In consideration for entering into an employment relationship with JPMorgan and entering into the agreements discussed above, Defendants were provided with significant benefits, including substantial compensation, office and support facilities, underwriting, research, brokerage operations and health insurance.

### JPMorgan's Confidential Information

57.    During the course of their employment by JPMorgan, Defendants had access to highly confidential JPMorgan client information in addition to other financial and trust and estate information that is confidential and proprietary to JPMorgan.  JPMorgan's client files contain confidential financial information, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Defendants had no interaction with any of the clients they serviced at JPMorgan (and no knowledge of any of their confidential information) until they started working at JPMorgan.  As indicated above, this

information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

58.     A critical factor to JPMorgan's continued success is its relations with its clients and advisors.  JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Private Bank employees, including Defendants, for them to use to obtain and build relationships with its clients.  Specifically, Defendants were given a travel and entertainment budget for client related activities.  Additionally, JPMorgan sponsors (and fully pays for) client events throughout the year, which Defendants can invite JPMorgan clients to.

59.     JPMorgan's records concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.  JPMorgan has invested substantial corporate resources to develop and maintain its client information.  Virtually every JPMorgan client that Defendants serviced was developed by JPMorgan at great expense and over a number of years.  JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

60.     JPMorgan has also expended significant resources to service its clients, all of whom were assigned or referred to Defendants by JPMorgan.  These resources include millions of dollars a year JPMorgan spends for sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual

registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendants.

61.     Employees such as Defendants must maintain client information as strictly confidential. These instructions are confirmed in the various agreements and policy manual provisions referenced above

62.     Unless Defendants' misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

63.     Defendants' misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, tortious interference, and unfair competition. Unless Defendants' conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct. This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

64.     By improperly soliciting JPMorgan's clients, Defendants have caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages. Defendants' wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

   (a) Loss of JPMorgan clients and loss of clients' confidence;

   (b) Injury to JPMorgan's reputation and goodwill in Illinois and
       other Midwest states;

    (c) Loss of JPMorgan employees, damage to office morale and stability, and the undermining of office protocols and procedures; and

    (d) Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

65.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 64 hereof.

66.    Defendants breached their contracts and agreements with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking JPMorgan's confidential client information. By engaging in such conduct, Defendants seek to convert to their benefit JPMorgan's protectable interests.

67.    As a direct and proximate result of Defendants' breach of their contracts and agreements, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### SECOND CAUSE OF ACTION
**(Misappropriation of Trade Secrets)**

68.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 67 hereof.

69.    JPMorgan's confidential and proprietary business and client information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information. JPMorgan expended substantial financial and human resources to develop this information, which cannot be

easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace. Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and client information, including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements. Accordingly, JPMorgan's confidential and proprietary business and client information constitutes trade secrets pursuant to statutory and common law.

70.     As a direct and proximate result of Defendants' misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

71.     JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 70 hereof.

72.     As employees of JPMorgan, Defendants owed JPMorgan a fiduciary duty of trust and loyalty.

73.     Defendants' fiduciary duties required them at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information. Defendants' fiduciary duties required them at all times to refrain from, among other things, soliciting JPMorgan's clients to join them at a competing company.

74. Defendants breached their fiduciary duty to JPMorgan by engaging in the conduct alleged above. Defendants engaged in such wrongdoing upon their resignation from JPMorgan and joining JPMorgan's competitor, Merrill Lynch.

75. As a direct and proximate result of Defendants' breaches of their fiduciary duties, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### FOURTH CAUSE OF ACTION
**(Breach of Duty of Loyalty)**

76. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 75 hereof.

77. By virtue of their positions with JPMorgan, Defendants owed JPMorgan a duty of undivided loyalty during the term of their employment with JPMorgan. Defendants' duty of loyalty prohibited them from competing with JPMorgan or assisting a competing business during the course of their employment with JPMorgan. Defendants' duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

78. Defendants breached their duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of their employment with JPMorgan.

79.     Defendants knew and intended, or knew and recklessly or negligently disregarded, that their acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

80.     As a direct and proximate result of Defendants' breaches of their duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.   Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### FIFTH CAUSE OF ACTION
**(Intentional Interference with Actual
and Prospective Economic Advantages)**

81.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 80 hereof.

82.     JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

83.     JPMorgan is informed and believes, and on that basis alleges, that Defendants knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

84.     JPMorgan is informed and believes, and on that basis alleges, that Defendants have intentionally, maliciously and improperly interfered with and continue to interfere with JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with them at their new employer, Merrill Lynch.

85.     There was no privilege or justification for Defendants' conduct. Moreover, Defendants' actions also constitute wrongful conduct above and beyond the act of interference itself, including breach of contract, unfair competition, and breach of their fiduciary duties.

86.     Defendants' conduct was willful and malicious.

87.     As a direct and proximate result of Defendants' tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SIXTH CAUSE OF ACTION
### (Negligent Interference with Actual and Prospective Economic Advantages)

88.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 87 hereof.

89.     JPMorgan entrusted Defendants with confidential information for use solely in performing their duties as employees of JPMorgan. As employees of JPMorgan, Defendants occupied positions of great trust and confidence. Defendants thereby owed JPMorgan a fiduciary duty to deal with JPMorgan in good faith and with loyalty. Defendants also were obligated to use due care so as not to interfere with JPMorgan's business relationships, including those with its clients.

90.     Defendants, in breach of their duty of due care, have attempted to induce JPMorgan clients to leave JPMorgan.

91.     JPMorgan is informed and believes, and on that basis alleges, that Defendants were fully aware that their failure to use ordinary care would cause JPMorgan to lose clients.

92.     As a direct and proximate result of Defendants' negligent interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SEVENTH CAUSE OF ACTION
### (Conversion)

93.     JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 92 hereof.

94.     At all times, JPMorgan was, and still is, entitled to the immediate and exclusive possession of its trade secrets and other proprietary information, and all physical embodiments thereof, as alleged above.

95.     JPMorgan is informed and believes that Defendants took JPMorgan's trade secret and other proprietary information, including but not limited confidential client contact information, and converted such information for the use of Defendants and those acting in concert with them.

96.     The continued detention of JPMorgan's personal property by Defendants constitute conversion.

97.     As a direct and proximate result of Defendants' conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## EIGHTH CAUSE OF ACTION
### (Unfair Competition)

98.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 97 hereof.

99.     Defendants' conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

100.     As a direct and proximate result of the Defendants' unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendants as follows:

A.     In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award in the underlying dispute, enjoining and restraining Defendants, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of Merrill Lynch, from:

> (a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendants at JPMorgan or whose names became known to Defendants by virtue of their employment with JPMorgan (or any of its predecessors in interest); and

> (b) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.      Ordering Defendants, and all those acting in concert with them, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendants or their counsel of the terms of such an order.

C.      Such other and further relief as the Court deems just and proper.

Dated:  August 23, 2018

Respectfully submitted,


**J.P. MORGAN SECURITIES LLC**


By: */s/ Anna Wermuth*
     *One of its attorneys*

Anneliese Wermuth (#6270970)
*awermuth@cozen.com*
Jenny Goltz (#6290036)
*jgoltz@cozen.com*
Corey T. Hickman (#6317871)
*chickman@cozen.com*
COZEN O'CONNOR
123 N. Wacker Drive
Suite 1800
Chicago, Illinois 60606